IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

5:03-CV-313-H(3)

DEC 0 1 2003

US DISTRICT COU... ...C
BY

| | | |
|---|---|---|
| DBM SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MOTION FOR LEAVE TO FILE** |
| | ) | **FIRST AMENDED COMPLAINT** |
| MUNIS, INC. and TYLER | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, dbm systems, Inc. ("dbm" or "plaintiff"), by and through undersigned counsel, hereby moves the Court for leave to amend its Complaint, pursuant to Rules 15 (a) and (c) of the Federal Rules of Civil Procedure and pursuant to the discovery scheduling order entered in this action. Plaintiff seeks to amend the Complaint in order to correct several references to the date of a meeting between Lee Horne of Munis and Mike Mueller of dbm during which the Agreement referenced in the Complaint was discussed. Plaintiff also seeks to revise the monetary amount requested in accordance with the findings of the report of Plaintiff's damages expert that has previously been served. A proposed First Amended Complaint is attached as Exhibit A.

IN SUPPORT OF ITS MOTION, Plaintiff shows unto the Court that there will be no prejudice to Defendants if leave is granted. Further, there has been no evidence of undue delay, bad faith or any dilatory motive. This motion is being filed prior to the expiration of the time to amend pleadings pursuant to the discovery scheduling order.

Respectfully submitted, this the 1st day of December, 2003.

JAMES T. JOHNSON, P.A.

By: James T. Johnson
N.C. State Bar No: 19087
Post Office Box 886
Raleigh, North Carolina 27602
Tel: 919-833-8133
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, James T. Johnson, do hereby certify that the foregoing document was served upon all parties of record by mailing a copy thereof to their attorneys at the addresses indicated below with the proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Postal Service in Raleigh, North Carolina, on the 1st day of December, 2003.

JAMES T. JOHNSON, P.A.

BY: _____
James T. Johnson
N.C. State Bar No. 19087
*Attorney for Plaintiff*
Post Office Box 886
Raleigh, North Carolina 27602
Telephone: (919) 833-8133

SERVED:

E. Hardy Lewis, Esq.
Blanchard, Jenkins, Miller & Lewis, P.A.
*Attorneys for Defendants*
116 N. West Street, Suite 200
Raleigh, North Carolina 27603



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

5:03-CV-313-H(3)

DBM SYSTEMS, INC.          )
                                    )
            Plaintiff,     )
                                    )
v.                               )     **FIRST AMENDED COMPLAINT**
                                    )
MUNIS, INC. and TYLER    )
TECHNOLOGIES, INC.,      )
                                    )
           Defendants.    )

Plaintiff, dbm systems, Inc. ("dbm" or "plaintiff"), with leave of Court and pursuant to the discovery scheduling order entered in this action, amends its original Complaint by substituting said original Complaint in its entirety with the following.

Plaintiff, complaining of defendants, alleges and says as follows:

## PARTIES

1.     dbm is a corporation duly organized and existing under the laws of the State of North Carolina, with its principal place of business in Wake County, North Carolina.

2.     Defendant Munis, Inc. ("defendant" or "Munis") is a corporation duly organized and existing under the laws of the State of Maine. Defendant is licensed to do business and is doing business in North Carolina with an office located in Raleigh, North Carolina. Defendant Tyler Technologies, Inc. ("Tyler") is a corporation duly organized and existing under the laws of the State of Texas. Upon information and belief, Munis has merged into Tyler and/or Tyler has purchased the assets and liabilities of Munis. Upon information and belief, Tyler owned and operated Munis during all times alleged herein. Tyler is, along with Munis, collectively referred



to as "defendant."

## FACTS

3.  dbm is in the business of providing computer related technology and software solutions and services to local government and education customers in the Southeast and Midwestern United States.

4.  Munis is also in the business of providing technology and software services, including networking, to local government and education customers in the United States.

5.  Prior to 1999, dbm and Munis worked together on various projects. In or about early 1999, Lee Horne ("Horne"), a Munis representative working in the Raleigh, North Carolina Munis office, contacted Mike Mueller ("Mueller"), the president of dbm, to request dbm's assistance in designing, developing and providing the necessary services to market and operate a computer software system that would enable local governments to print and mass produce a written business license certificate to be provided to businesses upon being granted a business license by that particular governmental entity. (Said computer software system and services product enabling a governmental entity to produce business licenses is hereinafter referred to as a "business license system.")

6.  At that time, in or about early 1999, Munis was marketing a financials computer software package to its governmental customers. Munis was marketing this package as including a business license system. However, Munis did not have an updated business license system that it could include as a part of this package. Horne explained to Mueller that Munis desperately and quickly needed an updated business license system that would interface[1] to its financials

---

[1] The financial information entries contained in and made on the dbm system had to appear on the Munis financials software journal entry import screen.



software system and be included in its total financials solutions. Horne explained to Mueller that Munis had already contracted with many of its customers to provide an updated business license system as part of its package, even though Munis did not have an updated business license system available for sale.

7.    At the time that Horne approached Mueller in or about early 1999 and requested dbm's assistance in designing and developing a business license system, dbm had no intention or business plan to write or develop a business license system. dbm's then existing company business plan was to develop and write a landfill billing system for its governmental customers. By early 1999, dbm had actually begun the initial stages of developing this landfill billing system. dbm anticipated there would be a dramatic increase in the demand for a landfill billing system during the latter half of 1999 because of the looming "Y2K" crisis.

8.    In their meeting in or about early 1999, Mueller explained to Horne that dbm was planning on writing a landfill billing system and had no intention of writing a business license system. Mueller further explained to Horne that it would cost dbm between $75,000.00 and $125,000.00 to design and develop a business license system and interface the system to the Munis financial software, and that if dbm agreed to work with Munis and develop the business license system, then dbm would be required to halt production of its landfill billing system, thus completely altering the company's long term business plan.

9.    In response to the concerns stated by Mueller, in their meeting in or about early 1999, Horne stated to Mueller that if dbm agreed to design and develop the business license system interfacing with the Munis financials software, Munis would market and sell the dbm business license system as a part of its complete software and programs package that it was then marketing to its customers. Horne stated that Munis would take 20% of the purchase price of



each business license system sold directly through Munis and that dbm would receive the remaining 80%. It was understood that if a sale was made direct by dbm, then no commission to Munis would be due, but a finders fee in the same amount would be paid to the local Munis representative.

10. Horne further explained that with each sale, dbm would be required to provide service on installation and continued service and upgrades and would receive additional income from all of this additional service. Horne further explained that the customer would also need to pay a relicensing fee for the dbm business license system on an annual basis to dbm, providing further income. If the customer did not pay the relicensing fee, that customer would stop getting the support services required to keep the business license system up to date and properly maintained.

11. In their meeting in or about early 1999, Horne provided to Mueller two documents that listed customers with whom Munis had already contracted, or was expecting to obtain a contract, to provide a business license system. One of these documents was a spreadsheet entitled "Business License Opportunities – Munis" and was dated March 22, 1999. ("March 22, 1999 spreadsheet," a true and accurate copy of which is attached as Exhibit A). The March 22, 1999 spreadsheet listed eight customers to whom Munis had already agreed to sell a business license system. Munis had already set the price for each system, as reflected on the March 22, 1999 spreadsheet. Each sale included the contract price, a price for the extended training that dbm would be required to provide, and an annual relicensing fee. Horne represented to Mueller that because these sales had already been made, if dbm agreed to develop the system, these were guaranteed sales for dbm.

12. The March 22, 1999 spreadsheet also listed two other customers, Hendersonville,



N.C. and Rome, Ga., that had not yet executed a contract with Munis, and five other potential customers. Horne represented to Mueller that Munis expected to sell its financials software package to these customers and that, if dbm agreed to design and develop the business license system for Munis, then Munis would sell the dbm business license system to these potential customers, and all future customers, as a part of its financials software package. The total of all sales of the dbm business license system listed on the March 22, 1999 spreadsheet, as represented by Horne to Mueller, was $108,000.00.

13.     In their meeting in or about early 1999, Horne also presented to Mueller a Munis internal memo dated February 24, 1999 listing all the governmental entities in Florida to which Munis had already contracted to provide a business license system. ("February 24, 1999 memo," a true and accurate copy of which is attached as Exhibit B). Again, Horne stated to Mueller that if dbm agreed to design and develop the business license system for Munis, Munis would sell the dbm business license system to these customers, and all future customers, as a part of its financials software package. The February 24, 1999 memo listed nineteen (19) different governmental entities. The total of all sales of the dbm business license system listed on the February 24, 1999 memo, as represented by Horne to Mueller, was $87,300.00.

14.     Horne stated to Mueller that if dbm agreed to the deal, dbm would quickly recoup its production costs and would generate substantial profits in excess of its costs. As represented by Horne to Mueller, after Munis took its agreed upon 20% margin on the sales identified on Exhibits A and B, the proposal would result in revenue to dbm derived from the direct sales of their business license system of $156,240.00. This amount did not include revenue dbm would receive from all other additional future sales to customers not listed on Exhibits A and B, which Horne stated would be substantial. Further, Horne stated to Mueller that the annual relicensing



fee applicable to all the customers referenced on Exhibits A and B would be 18%. Horne stated that Munis would not receive any margin or commission for the relicensing fees received by dbm. As represented by Horne to Mueller, the total of the relicensing fees to be received by dbm through the year 2005 for all the sales that Munis would make of dbm's business license system was going to be $214,618.00. Upon information and belief, the relicensing fees would have been collected beyond five years on most systems sold.

15.  Mueller was surprised that Munis had already contracted to provide a business license system to so many customers when in fact Munis did not have an upgraded business license system product to sell. Regardless, based on, and in consideration for, Munis' agreement to market and sell the dbm business license system to all of the customers listed on Exhibits A and B, and all future customers not listed thereon, and in consideration for all of the other representations made by Horne to Mueller referenced herein, dbm agreed to design and develop the business license system for Munis to interface with Munis financials. (hereinafter referred to as "the Agreement"). Again, Munis requested expedited production of the system. As a consequence, dbm halted all development of its landfill billing system to meet Munis' production demands.

16.  dbm developed the business license system fully interfaced with the Munis financials software on time at an actual cost of approximately $90,000.00. By June 1999, dbm had a demo system ready for presentation. Mueller and another Munis representative, Manuel McMinn, presented the business license system to several customers. The demonstrations went well and the customers were pleased with the system.

17.  By May of 2000, dbm had sold four business license systems pursuant to the Agreement. For each sale, dbm installed the system, trained all client employees how to run the



system, and provided any additional maintenance and services required. These four sales of the business license system were made direct to the customers for $31,500.00. Finders fees of $5,000.00 were paid to the local Munis representatives on these sales resulting in a net revenue of $26,500.00 to dbm.

18.     Upon information and belief, in or around June or July 2000, Munis began developing its own business license system. Upon information and belief, Munis used the dbm system as a prototype for its own system. Upon information and belief, during this same time period or shortly thereafter, and in direct violation of the Agreement, Munis began selling its own business license system to its customers, instead of the dbm system. Upon information and belief, Munis began stating to customers that the dbm system "only interfaced" and that the dbm system "was not fully integrated" as a selling point for its system even though it was Munis that had initially requested that dbm's system interface with the Munis system.

19.     In or about September 2000, dbm discovered Munis was selling its own business license system, instead of the dbm system, to its customers. Mueller spoke with Horne regarding this fact. Horne admitted to Mueller that Munis had developed its own business license system, but Horne stated to Mueller that Munis had done so to satisfy the request of one particular customer. Horne reassured Mueller that Munis would continue marketing and selling the dbm business license system to all its customers, as Munis had agreed to do.

20.     dbm continued to present its business license system to customers pursuant to the Agreement between the parties. dbm contacted one such customer, Phenix City, Alabama to schedule installation. However, Anthony Hunt of Phenix City informed dbm that a Munis salesman stated that Phenix City would have to buy the Munis business license system instead of the dbm system if it wanted Munis' complete financials software package. Hunt stated that as a



result of the pressure exerted by Munis, Phenix City was going to buy the Munis business license system instead of the dbm system.

21.     In or about November 2000, Mueller again approached Horne regarding the fact that Munis was again selling its own business license system instead of the dbm system in direct violation of the Agreement.  Horne responded by telling Mueller that "it's come down from the top" that Munis, in direct violation of the Agreement, was going to sell its own business license system, and not dbm's system, to all its future customers. Upon information and belief, since then, Munis has sold its own business license system to all of its customers, in direct violation of the Agreement, collecting an approximate revenue of $977,000.00, including service and relicensing fees, through September 2003.

22.     The dbm business license system was specially manufactured for Munis and was not marketable for resale without being sold in conjunction with any other software systems Munis was marketing and selling.  After Munis breached the contract between the parties and stopped marketing and selling the dbm business license system, dbm attempted to sell its business license system separately from Munis directly to the customers listed on Exhibits A and B, and to other customers.  However, dbm was now directly competing with Munis, its former business partner, who was now marketing its own business license system to the same customers.

23.     Because these software systems are normally sold as a fully interfaced package and because Munis had the financials software system necessary to complete the package, few customers were willing to purchase the dbm product when presented with a similar "Munis" product.  Despite continued efforts to sell its business license system, dbm made only one subsequent sale.

24.     Upon information and belief, in 2001, Munis approached several of the customers



that had purchased the dbm system (there were four total) and attempted to convince them to replace the dbm system with a Munis system. However, to date, all customers that purchased the dbm system have been completely satisfied with its performance. No customer that purchased the dbm system has requested it be replaced with a Munis system.

25. Munis' material breach of the Agreement resulted in direct lost revenue in business license system sales to dbm in an approximate amount of $977,000.00, including implementation and relicensing fees, for sales lost through September 2003, plus additional lost revenue for future sales.

26. In addition, in late 2000, after dbm realized its business license services product venture with Munis was going to be a catastrophic loss to dbm as a result of Munis' breach of the Agreement, dbm reinstituted its initial business plan, which Munis had previously convinced dbm to alter, of developing and designing a landfill billing software package. dbm has subsequently made numerous sales of its landfill billing system. However, the highest demand for a landfill billing system was in late 1999, pre-Y2K. As a result of being forced to delay its development and production of its landfill billing system, dbm lost substantial additional revenues.

27. Further, in or about June 1999, dbm had established and was marketing and selling an annual support plan to its governmental customers. During the discussions regarding the business license system Agreement referenced above, Mueller provided to Horne several marketing pamphlets describing dbm's annual support plan, upon Horne's representation that Munis would market and attempt to sell dbm's annual support plan to all of Munis' customers.

28. Upon information and belief, Munis in fact never marketed dbm's annual support plan as Horne had represented it was going to do. Further, upon information and belief, Munis



used the information it obtained from dbm through the representations above to develop its own annual support plan. Munis is now marketing its own annual support plan in competition with the dbm annual support plan.

### FIRST CLAIM FOR RELIEF
(Breach of Contract)

29.     The allegations contained in paragraphs 1 through 28 of plaintiff's Complaint are realleged and incorporated herein by reference.

30.     In or about early 1999, the parties entered into a valid and enforceable contract, the Agreement, whereby dbm agreed to design and develop a business license system for Munis on an expedited time schedule to be fully interfaced with the existing Munis software systems, at an expected total development cost of $75,000.00 to $125,000.00 to dbm, in exchange and in consideration for Munis agreeing to market and sell the dbm's business license system as a part its own financial software systems package to all of the customers and potential customers listed on Exhibits A and B and future customers.

31.     dbm performed all of its duties and obligations under the contract. Further, dbm altered its then existing overall company business plan to meet its contract obligations with Munis, which Munis was made aware of at the time the parties entered into the contract.

32.     After only the third sale of the business license system, Munis: 1) developed its own business license system based on and designed after the dbm system; 2) stopped marketing and selling dbm's system and began selling its own system to its customers to the exclusion of and in direct competition with dbm's system; 3) stated to dbm that it was not going to market or sell its business license system to any of its customers as it had previously agreed to do; and 4) unlawfully and without justification terminated the contract. Munis' actions stated herein

constituted a material breach of the contract. Munis materially breached the contract in other ways to be established through discovery and at trial.

33. dbm has further been damaged by Munis' breach of the contract and is entitled to recover substantial additional damages for lost sales of its landfill billing system as a result of dbm foregoing its original company business plan by delaying production of its landfill billing system to meet the expedited production needs of Munis pursuant to the contract.

34. dbm's agreement to provide to Munis information regarding dbm's annual support plan in consideration for Munis' promise to market and sell the annual support plan to its customers was also a contract between the parties. Munis breached this contract by not marketing dbm's annual support plan to its customers as it had agreed to do, and by developing and marketing its own annual support plan in direct competition with the dbm plan. Further, all of Munis' actions as alleged herein constitute a violation of the covenant of good faith and fair dealing. dbm has also suffered damage to its good will and reputation and other damages to be proven at trial.

35. dbm has been damaged by Munis' breach of the contract and is entitled to recover damages in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, plus interest and attorneys fees as allowed by law.

36. These damages were reasonably foreseeable and were proximately caused by Munis' material breach of the contract.

### SECOND CLAIM FOR RELIEF
(Negligent/Intentional Misrepresentation)

00113756.WPD



37.     The allegations contained in paragraphs 1 through 36 of plaintiff's Complaint are realleged and incorporated herein by reference.

38.     Defendant owed a duty to plaintiff to be truthful and reasonable regarding the representations and statements it made to the plaintiff.

39.     Defendant's representations made to plaintiff, as set forth above, regarding the fact that defendant would market and sell the plaintiff's business license services system as a part of its own software services package to all of its customers listed on Exhibits A and B and other customers if dbm designed and developed the system were negligent and/or intentional misrepresentations of material facts.  Defendant's representation that it would market dbm's annual support plan was also a negligent and/or intentional misrepresentation of material fact.

40.     Defendant made these representations either intentionally, or negligently, to induce plaintiffs to act thereon, and plaintiff did, without knowledge of the truth or falsity, directly or indirectly, justifiably and reasonably acted upon said misrepresentations to its injury, as set forth above.

41.     As a direct and proximate result of defendant's negligent and/or intentional misrepresentation of material facts, plaintiff has acted to its detriment, and is entitled to damages in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, plus interest and attorneys fees as allowed by law.

### THIRD CLAIM FOR RELIEF
(Quantum Meruit)

42.     The allegations contained in paragraphs 1 through 41 of plaintiff's complaint are



realleged and incorporated herein by reference.

43.     Plaintiff rendered valuable services to defendant as hereinabove described.  At the time plaintiff rendered said services, plaintiff reasonably expected to be fully compensated for said services.  Defendant received and benefited from these services with knowledge or reason to know that plaintiff expected to be fully compensated.  Defendant voluntarily accepted plaintiff's services and kept the benefits therefrom without refusing or returning the benefits.

44.     Plaintiff is entitled under the doctrine of quantum meruit, to recover damages from defendant in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, plus interest and attorneys fees as allowed by law.

### FOURTH CLAIM FOR RELIEF
(Unfair and Deceptive Trade Practices)

45.     The allegations contained in Paragraphs 1 through 44 are realleged and incorporated herein by reference.

46.     Defendants' conduct as alleged above was in or affecting commerce.

47.     Defendants' conduct as alleged above, constitutes unfair and deceptive trade practices within the meaning of N.C. Gen. Stat. §75-1.1, specifically including but not limited to:

          a)     coercing plaintiff to develop and design a business license system at a cost of $91,675.00 by stating to plaintiff that it would market and sell the plaintiff's system to all of its customers when it had no intention of doing so;

          b)     developing and producing its own business license system based on the plaintiff's system during a period in which it had gained access to the plaintiff's system as a result of the contractual arrangement between the parties, with the intention of marketing and selling its own system in direct competition with the plaintiff's system;



c) after ceasing all efforts to market and sell the plaintiff's system in violation of the contract between the parties, marketing and selling its own system in direct competition with the plaintiff's system;

d) after ceasing all efforts to market and sell the plaintiff's system in violation of the contract between the parties, attempting to coerce and convince the few customers that had purchased the plaintiff's business license system to replace the plaintiff's system with the defendant's system;

e) misrepresenting to plaintiff that it would market and sell dbm's annual support plan in order to gain access to information regarding dbm's annual support plan when it had no intention of marketing dbm's annual support plan, and instead used said information to design and develop its own annual support plan to directly compete with dbm's plan; and

f) in other ways set forth herein and to be established through discovery and at trial.

48. As a direct and proximate result of defendants' unfair and deceptive trade practices, as alleged herein, plaintiff is entitled to recover damages in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, plus interest and attorneys fees as allowed by law.

49. Plaintiff is entitled to recover treble the amount of damages caused by defendants' unfair and deceptive trade practices.

50. Plaintiff is also entitled to recover its attorneys' fees incurred in prosecuting this action.

## FIFTH CLAIM FOR RELIEF
(Punitive Damages)

51. The allegations contained in paragraphs 1 through 50 of plaintiff's complaint are realleged and incorporated herein by reference.

52. Defendant's actions, as set forth above, constitute malicious, willful and wanton



conduct, including but not limited to:

  a)  coercing plaintiff to develop and design a business license system at a cost of $91,675.00 by stating to plaintiff that it would market and sell the plaintiff's system to all of its customers when it in fact had no intention of doing so;

  b)  developing and producing its own business license services system based on the plaintiff's system during a period in which it had gained access to the plaintiff's system as a result of the contractual arrangement between the parties, with the intention of marketing and selling its own system in direct competition with the plaintiff's system;

  c)  after ceasing all efforts to market and sell the plaintiff's system in violation of the contract between the parties, marketing and selling its own system in direct competition with the plaintiff's system;

  d)  after ceasing all efforts to market and sell the plaintiff's system in violation of the contract between the parties, attempting to coerce and convince the few customers that had purchased the plaintiff's business license system to replace the plaintiff's system with the defendant's system;

  e)  misrepresenting to plaintiff that it would market and sell dbm's annual support plan in order to gain access to information regarding dbm's annual support plan when it had no intention of marketing dbm's annual support plan, and instead used said information to design and develop its own annual support plan to directly compete with dbm's plan; and

  f)  in other ways as set forth herein and to be established through discovery and at trial.

  53.  Defendant's actions as alleged herein demonstrated malice and a conscious and intentional disregard of and indifference to the rights of plaintiff, which actions defendant knew or reasonably should have known were reasonably likely to result in damage to plaintiff.

  54.  Defendant's actions as alleged herein constitute willful and wanton conduct which was related to the damages suffered by plaintiff.

  55.  As a direct and proximate result of defendant's malicious, willful and wanton conduct as alleged herein, plaintiff is entitled to damages in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of

00113756.WPD

15



dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, plus interest and attorneys fees as allowed by law.

56.     An award of punitive damages is warranted to punish defendant's egregious conduct and to deter defendant and others from engaging in similar conduct.

WHEREFORE, plaintiff, dbm systems, Inc. respectfully prays the Court as follows:

1.     Plaintiff have and recover damages from defendants, jointly and severally, in an amount in an amount in excess of $75,000.00 for lost sales of the business license system, services and relicensing fees, plus lost sales of dbm's landfill billing system, plus damage to its good will and reputation, plus lost sales of its annual support plan, the amount of such damages to be shown at the trial of this action, together with interest at the maximum legal rate and attorney's fees as allowed by law;

2.     Plaintiff have and recover punitive damages from defendants, jointly and severally, in an amount to be determined by the trier of fact or, in the alternative, that the damages awarded to plaintiff be trebled;

3.     Plaintiff have and recover its reasonable attorney's fees pursuant to N.C. Gen. Stat. § 75-1.1, *et seq;*

4.     The costs of this action be taxed against defendants;

5.     Plaintiff have trial by jury on all issues so triable; and

6.     Plaintiff have such other and further relief as the Court may deem just and proper.

This the _____ day of December, 2003.



JAMES T. JOHNSON, P.A.

_____

By: James T. Johnson
N.C. State Bar No: 19087
Post Office Box 886
Raleigh, North Carolina 27602
Tel: 919-833-8133
*Attorney for Plaintiff*



## CERTIFICATE OF SERVICE

I, James T. Johnson, do hereby certify that the foregoing document was served upon all parties of record by mailing a copy thereof to their attorneys at the addresses indicated below with the proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Postal Service in Raleigh, North Carolina, on the ___ day of December, 2003.

JAMES T. JOHNSON, P.A.


BY:_____
James T. Johnson
N.C. State Bar No. 19087
*Attorney for Plaintiff*
Post Office Box 886
Raleigh, North Carolina 27602
Telephone: (919) 833-8133


SERVED:

E. Hardy Lewis, Esq.
Blanchard, Jenkins, Miller & Lewis, P.A.
*Attorneys for Defendants*
116 N. West Street, Suite 200
Raleigh, North Carolina 27603