IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

5:03-CV-313-H(3)

| | |
|---|---|
| DBM SYSTEMS, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| v. | ) **MOTION FOR LEAVE TO FILE** |
| | ) **FIRST AMENDED COMPLAINT** |
| MUNIS, INC. and TYLER | ) |
| TECHNOLOGIES, INC., | ) |
| | ) |
| Defendants. | ) |

## STATEMENT OF THE CASE

The Plaintiff, dbm systems, Inc. ("Plaintiff" or "dbm") commenced this action by filing a Complaint in Wake County Superior Court on March 28, 2003. On April 28, this action was removed to this Court, and on May 19, 2003 Defendants filed their Answer and Crossclaim. On July 2, 2003, the Court entered the Scheduling Order, which designated December 1, 2003 as the deadline to amend pleadings. This matter is before the Court on Plaintiff's Motion for Leave to File First Amended Complaint.

## STATEMENT OF THE FACTS

1. <u>General Facts.</u>

dbm and Defendant Munis, Inc. ("Defendant" or "Munis") are in the business of providing computer related technology and software solutions and services to local government and education customers in the Southeast and Midwestern United States.

In or about early 1999, Lee Horne ("Horne"), a Munis representative working in the Raleigh, North Carolina Munis office, contacted Mike Mueller ("Mueller"), the president of

dbm, to request dbm's assistance in designing, developing and providing the necessary services to market and operate a computer software system that would enable local governments to print and mass produce a written business license certificate to be provided to businesses upon being granted a business license by that particular governmental entity. (Said computer software system and services product enabling a governmental entity to produce business licenses is hereinafter referred to as a "business license system.") (Compl. ¶ 5).

At that time, in or about early 1999, Munis was marketing a financials computer software package to its governmental customers. Munis was marketing this package as including a business license system. However, Munis did not have an updated business license system that it could include as a part of this package. Horne explained to Mueller that Munis desperately and quickly needed a business license system that would interface[1] to its financials software system and be included in its total financials solutions. Horne explained to Mueller that Munis had already contracted with many of its customers to provide a business license system as part of its package, even though Munis did not have an updated business license system available for sale. (Compl. ¶ 6).

In their meeting, Mueller explained to Horne that it would cost dbm between $75,000.00 and $125,000.00 to design and develop a business license system and interface the system to the Munis financial software, and that if dbm agreed to work with Munis and develop the business license system, then dbm would be required to drastically alter the company's long term business plan. (Compl. ¶ 8).

In response to the concerns stated by Mueller, in their meeting in or about early 1999,

---

[1] The financial information entries contained in and made on the dbm system had to appear on the Munis financials software journal entry import screen.

00113756.WPD

2

Horne stated to Mueller that if dbm agreed to design and develop the business license system interfacing with the Munis financials software, Munis would market and sell the dbm business license system as a part of its complete software and programs package that it was then marketing to its customers. Horne stated that Munis would take 20% of the purchase price of each business license system sold directly through Munis and that dbm would receive the remaining 80%. It was understood that if a sale was made direct by dbm, then no commission to Munis would be due, but a finders fee in the same amount would be paid to the local Munis representative. (Compl. ¶ 9).

Horne further explained that with each sale, dbm would be required to provide service on installation and continued service and upgrades and would receive additional income from all of this additional service. Horne further explained that the customer would also need to pay a relicensing fee for the dbm business license system on an annual basis to dbm, providing further income. If the customer did not pay the relicensing fee, that customer would stop getting the support services required to keep the business license system up to date and properly maintained.

Horne stated to Mueller that if dbm agreed to the deal, dbm would quickly recoup its production costs and would generate substantial profits in excess of its costs. (Compl. ¶ 14).

Mueller was surprised that Munis had already contracted to provide a business license system to so many customers when in fact Munis did not have an upgraded business license system product to sell. Regardless, based on, and in consideration for, Munis' agreement to market and sell the dbm business license system to all future customers, and in consideration for all of the other representations made by Horne to Mueller referenced herein, dbm agreed to design and develop the business license system for Munis to interface with Munis financials. (hereinafter referred to as "the Agreement"). Munis requested expedited production of the

system. (Compl. ¶ 15).

dbm developed the business license system fully interfaced with the Munis financials software on time at an actual cost of approximately $90,000.00. By June 1999, dbm had a demo system ready for presentation. Mueller and another Munis representative, Manuel McMinn, presented the business license system to several customers. The demonstrations went well and the customers were pleased with the system. (Compl. ¶ 16).

By May of 2000, dbm had sold four business license systems pursuant to the Agreement. For each sale, dbm installed the system, trained all client employees how to run the system, and provided any additional maintenance and services required. These four sales of the business license system were made direct to the customers for $31,500.00. Finders fees of $5,000.00 were paid to the local Munis representatives on these sales resulting in a net revenue of $26,500.00 to dbm. (Compl. ¶ 17).

Upon information and belief, in or around June or July 2000, Munis began developing its own business license system. Upon information and belief, Munis used the dbm system as a prototype for its own system. Upon information and belief, during this same time period or shortly thereafter, and in direct violation of the Agreement, Munis began selling its own business license system to its customers instead of the dbm system. (Compl. ¶ 18).

In or around September 2000, dbm discovered Munis was selling its own business license system, instead of the dbm system. Mueller spoke with Horne regarding this fact. Horne admitted to Mueller that Munis had developed its own business license system, but Horne stated to Mueller that Munis had done so to satisfy the request of one particular customer. Horne reassured Mueller that Munis would continue marketing and selling the dbm business license system to its other customers as Munis had agreed to do. (Compl. ¶ 19).

dbm continued to present its business license system to customers pursuant to the Agreement between the parties. However, dbm learned that Munis had again attempted to sell its business license system instead of the dbm system. (Compl. ¶ 20).

In or around November 2000, Mueller again approached Horne regarding the fact that Munis was again selling its own business license system instead of the dbm system in direct violation of the Agreement. Horne responded by telling Mueller that "it's come down from the top" that Munis, in direct violation of the Agreement, was going to sell its own business license system, and not dbm's system to all customers. (Compl. ¶ 21).

Since that time, Munis has made approximately $977,000.00 in sales of its business license system. This is direct revenue lost by dbm as a result of Munis' material breach of the Agreement. dbm suffered additional losses and damages as a result of Munis' breach of the Agreement.[2] (Compl. ¶ 25).

2. <u>Facts Specifically Related to the Motion for Leave to File Amended Complaint.</u>

The original Complaint alleges that the meeting during which the Agreement was first discussed occurred in or about June 1999. However, further investigation and discovery has revealed that the actual date of this meeting was earlier in 1999.

In addition, prior to the filing of the Complaint, Plaintiff was not aware of the actual

---

[2] Further, in or about June 1999, dbm had established and was marketing and selling an annual support plan to its governmental customers. During the discussions regarding the business license system Agreement referenced above, Mueller provided to Horne several marketing pamphlets describing dbm's annual support plan, upon Horne's representation that Munis would market and attempt to sell dbm's annual support plan to all of Munis' customers.

Upon information and belief, Munis in fact never marketed dbm's annual support plan as Horne had represented it was going to do. Further, upon information and belief, Munis used the information it obtained from dbm through the representations above to develop its own annual support plan. Munis is now marketing its own annual support plan in competition with the dbm annual support plan.

Munis sales of the business license system after it breached the Agreement and began selling its own system. Therefore, the damages calculations had been based on the revenue that Munis had promised dbm during the initial meeting between the parties. Defendants' discovery responses, which were served on October 3, 2003, revealed the actual sales Munis made after it breached the Agreement, through September 2003. This is the figure upon which dbm's actual damages in this action are based, as but for Munis' breach, dbm would have made these same sales. dbm's damages are more fully addressed in the Rule 26(f) report of Plaintiff's damages expert, which was served on November 20, 2003.

dbm requests leave to amend the Complaint to reflect these two revisions.

## ARGUMENT

Rule 15 (a) of the Federal Rules of Civil Procedure states that a party may amend a pleading at any time by leave of the court, and that "leave shall be freely given when justice so requires." Since the function of Rule 15(a) is to enable a party to assert matters that were overlooked or unknown to him at the time he filed his original complaint, leave to amend should be freely granted in the absence of any:

> undue delay, bad faith or dilatory motive on the part of movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment, futility of the amendment . . .

Foman v. Davis, 371 U.S. 178, 182 (1962).

A court will deny leave to amend only if the non-moving party is in fact prejudiced by the delay. See, Edwards v. City of Goldsboro, 178 F. 3d 231, 242 (4th Cir. 1999). Delay alone, without specifically resulting in prejudice or any obvious design or dilatoriness to harass the opponent, should not suffice as a reason for the denial. Id. As the rule requires, in the absence of any apparent or declared reason, the leave sought should be "freely given." Foman, 371 U.S. at

182.

Plaintiff is not seeking to add a party or a new claim. It is merely making corrections to the referenced date of one meeting and is changing references to the amount of damages to reflect the findings in the report of Plaintiff's Rule 26(f) damages expert, which has already been served upon Defendants. Defendants will not be prejudiced by these amendments, and this request is being made within the time allowed pursuant to the discovery scheduling order.

## CONCLUSION

Based upon the arguments contained herein, and upon the authorities cited in support thereof, Plaintiff respectfully requests that the Court grant its Motion for Leave to File First Amended Complaint.

This the 1st day of December, 2003.

JAMES T. JOHNSON, P.A.

By: James T. Johnson
N.C. State Bar No: 19087
Post Office Box 886
Raleigh, North Carolina 27602
Tel: 919-833-8133
*Attorney for Plaintiff*

00113756.WPD

7

## CERTIFICATE OF SERVICE

I, James T. Johnson, do hereby certify that the foregoing document was served upon all parties of record by mailing a copy thereof to their attorneys at the addresses indicated below with the proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Postal Service in Raleigh, North Carolina, on the 1st day of December, 2003.

JAMES T. JOHNSON, P.A.

BY: _____
James T. Johnson
N.C. State Bar No. 19087
*Attorney for Plaintiff*
Post Office Box 886
Raleigh, North Carolina 27602
Telephone: (919) 833-8133

SERVED:

E. Hardy Lewis, Esq.
Blanchard, Jenkins, Miller & Lewis, P.A.
*Attorneys for Defendants*
116 N. West Street, Suite 200
Raleigh, North Carolina 27603